Case numbers 15-1433 and 15-1611. Caterpillar Logistics Inc v. NLRB Oral arguments not to exceed 15 minutes for petitioner. 15 minutes will be shared by respondent and intervener. Mr. Joseph Torres for the petitioner cross-respondent. Good morning judges. May it please the court. My name is Joseph Torres. I represent Caterpillar. I'd like to reserve four minutes for rebuttal this morning. Thank you. May it please the court. This case arises principally out of a union election that was held at Caterpillar's Clinton, Ohio facility at the end of September 2013. In that election, a majority of employees voted against representation by the United Auto Workers. And the governing principles that we're here to talk about look at both the balance to be struck between employees' rights to engage in Section 7 activity and the rights to refrain from that and equal weight that's accorded by the Act to both of those rights. As a result of that balance or that right, equal right, the Act by its terms and the boards through its case law have recognized that an employer such as Caterpillar has historically had the right to voice its opposition to an organizing campaign, to continue pre-existing operations following the filing of an election petition, and to engage in non-coercive conversations with its employees regarding matters that clearly are of a mutual interest and concern to both employees and managers at this facility. Despite these principles, the board's findings of Caterpillar in this case are entitled to no deference because they ignore substantial evidence and they improperly tilt the Act's balance for competing interests against the company's ability to do the things that I just outlined. To proceed with the implementations of actions that originated in the pre-election time period, to voice its lawful opposition to union organizing efforts, and to have its supervisors engage in non-coercive conversations with employees regarding employees' union concerns or views concerning the union activity, which obviously are of equal concern to both Caterpillar, its managers, and employees. And the board's errors are particularly acute in this case because the evidence showed an open and robust organizing campaign on both sides of the proposition, for and against the union, that occurred after the election petition was filed, and the evidence is undisputed that that activity continued to increase up until the time the election was held, and that employees at the end of that process decisively voted against union representation. There's also an unrelated issue in this case having to do with the discharge of an employee which took place. In the interview, there are several different aspects to the case, so-called unfair labor practices. Is there anything in the record that would indicate how or what was meant by that and how the management knew who all the employees were who were, quote, agitating for the union? Yes, Your Honor. So the issue you're relating to was a conversation that took place after the petition was filed, so when the organizing activity was ongoing. And the evidence in the record is from numerous employees called by the general counsel who admittedly agreed that they engaged in open activity at the facility encouraging other- If the management had known, you said, all of the employees the management knows, how would that information have been obtained? I think the record evidence, and I think Member Johnson noted this in his dissent, Your Honor, was that this was open and notorious union activity at the time the conversation took place at the facility. And there's numerous employees who testified to that fact, that they were engaged in open union activity at the facility. And many of those, if not all of those employees, agreed with us at trial that the level of activity at the facility after the petition was filed and leading up to the actual election vote increased. So it wasn't a situation where the union organizing effort, the record is that it was all subterfuge and employees were trying to, at the time this conversation took place, hide their activity from the company. There was no evidence that that was the tone of the campaign. Quite the contrary, the evidence was- Answer my question. How did management know who all of the employees are who were for the union and working for the union? That's my question. I think he- That's the statement in the record now. I assume the statement is accurate. And all I want to know is what do you understand to be the method by which Caterpillar knew this information? Yes, Your Honor. I believe the observation of the activity at the facility was the basis for the statement that management knew the employees who were engaged in this union activity. And I don't remember if Mr. Urey specifically said all, but certainly he said if his understanding was that the people who were involved or the people who were openly engaged in this activity, then that's the source of the information that Mr. Urey would have been referring to because- But realistically, weren't there something like 435 employees at the facility? Correct. So I guess Judge Merritt's question is one that I have as well. I mean, how would management know that X number supported the union and X number did not? We're not talking 10 or 12 people. We're talking a very sizable workforce. I understand, Your Honor. And, again, I believe from the perspective of Mr. Urey and his understanding of what the atmosphere was, whether he could state with mathematical precision the number of individuals who were involved, I grant maybe was not permissible. What about Mr. Sponsler and Mr. Applin? Had they made their views known generally or to their supervisors that they supported the union or did not support the union? So Mr. Sponsler testified that before his conversation with Mr. Urey, he, in fact, had disclosed his support of the union to another member of management at the facility. He also testified that he was encouraging other employees at the facility to vote for the union. He was encouraging employees to solicit to sign authorization cards. All of that, he admitted, took place after his conversation with Mr. Urey. And so, again, it would not be an unreasonable conclusion that someone who admittedly was engaged in that activity was someone who was not hiding his union sympathies. The other guy, but the other fellow who was questioned had not indicated anything, right? That's correct, Your Honor. But the question to Mr. Applin was, what did you think about the meeting you just attended? He did not. That's what the board found was a specific question posed to him. Mr. Applin testified that he was asked, how are you going to vote in the election? But what the board found he was asked was, what did you think of the meeting? A meeting that Mr. Butcher did not attend. And so there was nothing about the question asked of Mr. Applin, who, you're right, Your Honor, said he was not an open union supporter, that necessarily required him to disclose anything concerning his union sympathies one way or the other. He could have said the meeting was boring, it was too hot in there, it was too long. You're saying that just that little conversation, you can't make an inference of any union animus or anything from that. That's what you're saying. That's correct, Your Honor. Both under the Rossmore case, which the board cites in support of its conclusions, and this court's decision in Oken, innocuous, occasional, non-coercive inquiries concerning union sympathies does not violate Section 8A1. And so asking a known or even unknown union supporter, what do you think about the union? Or what are your views on the union? Or asking another employee, what do you think of the meeting in an open area on a one-on-one brief conversation that from their testimony included maybe two or three exchanges? There's nothing about the context of that in either of those exchanges that would reasonably suggest any level of coercion on the part of the supervisors. Was there something in the record, I just recall seeing it, maybe it's Mr. Butcher and Mr. Urey were either under pressure to or required to report those employees who maybe voiced union support. There was some sort of a report or rating that would go to the supervisors. That's correct, Your Honor. The board found that there was some inference as to why they would have asked these questions because they were being asked to explain to management how they thought employees were thinking about this organizing campaign. But again, Your Honor, there's nothing in the law that prohibits an employer from trying to determine what its employees' views are vis-à-vis the union. And so asking non-coercive questions in that regard does not place some unlawful gloss on a non-coercive question. Would it make a difference if Butcher or Sposser and Applin knew that they were going to be reported on in terms of their views? Does that change the talk about context?  I understand, Your Honor. Well, they didn't know. Yeah, that's what I'm questioning. I know what the record was. Yes. I mean, I certainly think in either instance, given the nature of the inquiry, what was actually found to have transpired. The fact that the supervisor in his mind was thinking, I'm going to ask this question and I'm going to use it to report back my views on how employees are thinking, does not turn the conversation into an unlawful exchange unless the facts show that they were doing it in some coercive manner. They were pulling the employee into an office. They were stating the statements in some menacing fashion. None of that is in the record here. So even if, Your Honor, that was what was motivating these supervisors to make these innocuous inquiries, it does not turn an objectively non-coercive conversation into a coercive one. Your time is getting short. Would you address the safety, the bonus? Yes, Your Honor. There's two errors here, and let me start with the legal errors, which is the Board's conclusion here is that this bonus was unlawful because there was no firm decision made regarding this bonus prior to the filing of the petition and that the program was full of contingencies. But this Court's decision in Torbett specifically holds in a very factually analogous situation that the fact that there may be some unfulfilled aspects of a program does not make it unlawful to announce it when the evidence shows that the decision to actually pursue the line of activity that results in the payment of the bonus predates the petition. And here, the condition that the Board relies upon, which is the submission of the Chairman's award, was actually made in late 2012. The Board doesn't acknowledge that in their findings, and they also specifically budgeted the money to be paid in 2013 and 2012. So those are all well before the petition. And just one last thing because I see my time is up. When Mr. Slocum announces this to employees in March of 2013, he tells them that the submission would be made in the fall of 2013, again, a point the Board does not acknowledge, and that the payment would be made in the October time frame, again, well before the petition was filed. So we believe that the continuum of events show that there was a firm decision made in 2012. It was implemented in accordance with the time frame that was outlined previously, and I see my time is up, so I'll reserve the rest. I have a couple of questions because we don't have much time here, I'm sorry to say, and it's about Kraft. Yes, sir. Now, Kraft is still discharged. He's not working there. Correct. And the problem I have here is he was discharged by the general manager, Purcell, and he obviously, Kraft, was mad when he found out about this little incident and used some bad language, saying the gloves are coming off now and I'm sick of it, and he was mad because he thought management was treating him like thugs by putting up a guardhouse and so on. But it seemed pretty clear that he wasn't actually going to go shoot or hurt Purcell. He was just mad, and he was using figurative language, and that's what the ALJ found. Yet management, Purcell decides two or three days later, apparently, to fire the guy because now management is mad. Purcell is mad, and that's the finding of fact entitled to substantial evidence review. That disturbs me that this guy gets fired over that. Yes, Your Honor. Well, actually, the board did find that he issued a threat. They tried to downplay the threat by saying that he juxtaposed it with some reference to the union. So with respect, Your Honor, I believe the finding is that he actually threatened Purcell. The gloves are going to come off. I mean, you know, you can take that. That doesn't mean he's going to go try to punch Purcell in the face. Yes, Your Honor. That means, figuratively speaking, he's mad, he's obviously mad, and he's going to now be for the union. Yes, Your Honor. Well, again, we believe that, first off, that what Mr. Purcell was reacting to had everything to do with his perceived humiliation of Mr. Purcell and nothing to do with any other issue of mutual concern to employees, and that when he was making the reference to Mr. Purcell without using the colorful language that he employed, the board found that he made a threat. And the only question is whether invoking in the abstract the union at the same time somehow allows you to threaten what the board found was a threat to Mr. Purcell, and the mere fact that you, in the course of doing so, make some generalized reference to the union somehow allows you to engage in what the board found to be a threat. And then if you look at it outside the context of the NLRA, the treatment of Mr. Purcell, whether we all, in our own perspectives, would perhaps have dealt with the situation differently, the evidence shows he was treated inconsistently with our Caterpillar-employed and zero-tolerance policy at the facility. And, again, we all might make different decisions about that, but we think the evidence clearly shows that he was treated consistently with policy. I still agree with that. That's not about to go get in a big fistfight with Purcell. I mean, that's obvious. Thank you, Your Honor. Okay. Thank you, Mr. Torres. Good morning. May it please the court, my name is Valerie Collins, and I represent the National Labor Relations Board. With the court's permission, the board would like to split our time ten minutes and then five minutes for the intervener union. Okay. Substantial evidence supports all of the board's findings here, that the company violated the act on numerous occasions, first by interrogating two employees in two separate instances by How much time? Yes. Just get down to the things that bother me about it. This business, the management won this by 40 or 50 votes, so it was not a close election particularly. You had quite a few people voting, and it was not overwhelming, but it was a substantial victory for management. And I don't see how asking these questions to the employees, for example, by the two supervisors, how that could have affected sufficiently the number of employees to make this kind of vote. And I think one of the members of the board raised a question about that. Isn't that right? But I agree. I have a question about that. I mean, how do you find that? Well, in order to answer your question, I kind of have to unpack it a little bit. There are two things going on in this case. There are unfair labor practices, and then there are also election objections, and those are two different objections, and there are two different types of violations found. Before the court today are only the unfair labor practices because it's well settled, and as the company admits this, as it must in its reply brief, it's well settled that a board order for a new election is not subject to direct review. And so before the court, we're not even talking about these election objections. I mean, only before the court is the unfair labor practice because that's a separate and wholly apart violation. You can't consider the fact of what the vote was and what effect it would have had? We can't consider that? That's correct. It's not before the court. The court has jurisdiction only over the unfair labor practice, and I think that the company's reply brief adequately explains. . . The unfair labor practice based on the effect of the conduct of the supervisors? I mean, how are you going to separate out what the effect of it was from the statements that were made? I don't understand how you can abstract away the question that I'm talking about. Well, there are two different legal standards. I mean, there are two different types of violations of the Act. There are two different legal standards. The Court of Appeals views them differently. It's not the same substantial evidence standard. You could have independent unfair labor practices, and here in this case they are. . . If the margin had been 300, you know, we still couldn't take it into account? Not at this point in the proceeding, no. What the company could do is if later on, if the board orders a second election and the union wins in the second election, the company could refuse to bargain with the union, and the union would file a charge, an unfair labor charge, that says that the company fails to bargain with the union, and at that point it's an unfair labor practice that would be before the court. So it's not like the court is never going to be able to review the company's objections to the board's finding concerning the election. It's just . . . I guess you put in your brief, but if you have the name of a case that's decisive that we may simply not consider the margin of victory here on the effect of these two interrogations that we're concerned about. Do you have a case or . . . I mean, you're saying that we simply have got to abstract that out of our thinking and that cannot make any difference as to the effect of this interrogation, and that does not seem reasonable to me. Tell me why. Well, because the Supreme Court said so. I mean, I don't have a kind of slam dunk answer, but it is very well established that it's just simply not before the court. There's binding Sixth Circuit cases. There's cases before the court. It is, it is, but only the unfair labor practice. And the Sixth Circuit has evaluated this in U.S. Electrical Motors and said, you know what, it's pretty clear. There are arguments to the contrary. I mean, for example, in their reply brief, they talk about in the Fourth Circuit Judge Wilkinson has said, hey, in this situation, this doesn't make a lot of sense because we're talking about the same thing. But even in that opinion, I mean, it's a dissent, and he acknowledges the fact that the binding law in that circuit as well as from the Supreme Court says that before the court are the unfair labor practices at this point in the proceedings and not the election objections. And so you can have an unfair labor practice with just one person impacted. You don't have to have a huge consequence of, you know, hundreds of people were interrogated in a room. You can have an unfair labor practice where it is one-on-one, and often they are because the act protects. The name of the case says we may not consider the effect of this. On the unfair labor practice part? Yeah. Yes. There is American Federation of Labor, which is at 308 U.S. 401 from 1940. In this circuit, there is U.S. Electrical Motors, which is 722 F2nd 315. At that point, I mean, I guess my only answer is it is clear. It is clear. But I also want to assure the court that while that is not before this court right now, it's not as if the company never gets to raise those issues. So it's not as if the board is saying you never get to evaluate whether we messed up or not on the election objection issues. It's just the policy that you may not need to. And so in order to speed things along, it's just the ULP before the court. And I know that my time is running out, and I wanted to discuss just briefly the impression of surveillance violations. Now, the law is clear that an employer creates an impression of surveillance by telling employees that it's aware of their union activity without disclosing anything more. So here, when the supervisor was talking and asking Mr. Sponsler about his union sympathies, he was, in fact, nervous. And he said to his supervisor, you know, I do support the union, but honestly, I'm scared that Caterpillar is going to retaliate against me. And in response, that supervisor said, oh, no, don't worry. We already know everyone who's involved in the union organizing campaign. He said everyone and nothing more. And the law is clear that when an employer says a statement like that and an employee is kind of left to their own devices thinking, oh, no, how did he know that? How do they know all of this? That, by its very nature, is giving the employees the impression that their union activities are under surveillance. And it's the objective impression that is important here. It doesn't. I understand what you're saying, but obviously in terms of human nature, the employer is going to be interested in finding out who is agitating for the union. They're going to go about investigating that, and they're entitled to do that. Yes. They're even entitled. I mean, you take it a step further. I mean, there's no per se violation or anything wrong with even asking questions. But the board addresses those situations and looks at all of those circumstances. What exactly is wrong with saying we know everyone who is for the union after the response is we're all afraid you're going to dock us for being in favor of the union? What's wrong with that kind of response? It essentially leaves the employee in a state of mystery. Who knows where they got that information? And, I mean, if you take a step back practically, just as an example, if someone told me, you know, Ms. Cohens, I really liked what you were wearing on Saturday and nothing more, I think it's kind of obvious that that would be a little creepy. I'd be wondering, how do they know that? I mean, without more, the employees are left to thinking, how do they know that? Especially because the language that the supervisor used here was so all-inclusive. He said everyone. He didn't say people who wear buttons or people I've spoken to before. He said everyone. And I think the board, there's more than substantial evidence that supports the conclusion that that was a violation. Just, I know I have to add three minutes to your time because we asked you a lot of questions about, you know, what we could review. Jurisdiction. I did want to definitely mention the benefits violation. And, you know, the law is relatively clear that, you know, by promising or granting a benefit right before an election that may reasonably tend. The problem is they've been talking about it for months. That is, so the employer is saying here that the board should have viewed this safety bonus as a preexisting benefit. And because a preexisting benefit, I mean, you're not announcing anything new. You submitted to the chairman and we're going to go through that process, et cetera. And all of that had been previously discussed, as I understand it. Yes, and they could discuss it as much as they want to. But what we're looking at, what the board looks at here, is what they told employees. I mean, the impact of these statements. Even though you've been discussing it all. They can. Before, once you're in a battle, you have to deny it to the employee. I don't think you have to deny it. You either give it to them or you don't. Yeah, so just to kind of give a little bit of context here. So factually, they may have discussed it and closed doors. So according to the company, they made this decision in November 2012 to change the way they do their bonus system. So in years past, it had been this kind of quarterly system called gain sharing where there were a lot of factors involved, including safety, attendance, and other factors. And they claim that in November of 2012, they decided that they wanted to do something different. Is there any evidence to the contrary? No, there's no evidence that they decided to do something different. But the key point is what they told the employees. And what the company is arguing is that in March and in July, they told employees, you're getting this new safety bonus, it's a done deal. And so their subsequent announcement in September, a week before. The undisputed testimony is the decision was made prior. And you have no evidence to the contrary. The fact that they announce it, I mean, it's predetermined, right? I mean, I don't know how you make. Well, there's two different violations.  Because the way the board views these is as an objective employee. So if the company decided. What was wrong with the announcement? Assuming the company's decision was made prior to this critical time, the decision's already made, now what makes the announcement a violation? Because it could have a reasonable tendency to impact employees' free will. They made it the week before the election, and there's the violation. Even though the decision had been made beforehand. Yes. So it doesn't make any sense to me. Well, if you think about it, I would have to respectfully disagree. Because that announcement links improved working conditions with the defeat of the union. In the same way that if the company took away benefits a week before the election, it would link inferior working conditions. No, I mean, but under your theory, if benefits had already been decided to be given, they cannot be announced during this critical period. It must be put on hold, and therefore the union, actually the union members, suffer because you're going through an election process, since all these things have to be on hold because they could be interpreted as influencing the election. And even though the only evidence is no, they were all decided ahead of time. I mean, it makes no sense, I don't think. It hurts the very people that the board is trying to protect. If the company had made the announcement after the union election, it would be no different. I mean, I think the crucial factor is why did it decide to announce this the week before the election? They weren't canning out checks the week before the election. They just made the announcement. The timing. Oh, the timing is everything. Okay, not the announcement itself, but the timing. The timing is everything here. A week before the election, they said that they have this new bonus. And that is what the board found. And the timing hadn't been pre-decided before. Exactly. They say the decision had been made, but when they were going to announce it hadn't been made until after the election process had begun. Exactly, after the union was on the scene. The week before the election is the first time they told employees, you are absolutely getting this benefit. And the company's argument is that, I see that my time has expired. You may finish your answer. Okay, the company's argument is that because they announced that it was a possibility before the union came on the scene, the board erred by distinguishing those facts. So a promise, a conditional promise, and a promise. And there's ample evidence to support the board's findings that those are, in fact, two different things. And, again, my time has expired for the foregoing reasons. We would ask that this court enforce the board's order in full. Okay, thank you, Ms. Collins. Ms. Watson. May it please the court, my name is Kristen Seifert Watson, and I represent the intervening party, the UAW, in this matter. I wish to use my time today to respond to some of the discussion that has already taken place. One of the questions I was asking about, as I remember, I may be wrong, but one of the members of the board was concerned about the fact that this interrogation process could not have affected the outcome of the vote. It said something about that, and the member dissented. I can't remember whether that was one of the bases of the dissent, but didn't one of the members of the board say, well, you know, the union lost by such a margin that this would not have made any difference? That is true, Your Honor. However, the dissenting member did not say that it should not be an unfair labor practice violation, simply that it should not be an independent grounds for overturning the election. That dissenting member did not dissent as to turning over the election with regard to the benefit issues that have been more recently discussed. But we're not reviewing that, right? You're not reviewing the decision to set aside the election. Well, hard time with that concept. Right, it is very challenging, and I'll talk about the interrogation in a moment for why I do believe that unfair labor practice has occurred. And also, the UAW did present evidence of dissemination of those two conversations to at least 12, roughly 12, 13 employees. So at least 12, 13 employees, we have evidence, knew about that at the time they voted of those two occurrences. But I wanted to clarify a very important point about the safety bonus. The decision to give the bonus was not made before the union came on the scene. In November 2012, Caterpillar decided to set up a program. They set aside. They had to submit it to the chairman. It was a chairman's bonus. Correct. So they had to go through a process, the last step of which was to submit it to the chairman of Caterpillar, I guess. Correct. And only Caterpillar's chairman could say yes or no about that. That's not correct. And that's what distinguishes this case from the cases Caterpillar relies upon. The bonus was triggered not by winning the award but by submitting for the award. And in March and in July, the substantial evidence indicates Caterpillar Logistics in Clayton, Ohio, had not yet decided to submit. It submitted in September before the deadline. The election was September 27th. The deadline for submitting was September 30th. They decided to submit early and announce 10 days before the election, hey, we submitted, we're giving you this money. Caterpillar, in its briefing, set this up as a simple if-then. In November 2012, if they submit for an award, then you get the bonus. And that's true, except it's an if we feel like it then, because it was totally in Caterpillar Logistics and Clayton's hands whether to grant that bonus. There was no criteria, no minimum threshold required for making the submission. They simply decided during the critical period to make the submission and then manipulated the timing of the announcement to occur within 10 days of the election. It was a process that could be speeded up or slowed down. That's what you're saying. Exactly. And they speeded it up, you're saying. They wouldn't have done this except for the union situation. That is what I'm saying, Your Honor. There was no purpose to announcing the bonus at the September meeting. The bonus, again, they should have. If they weren't in favor of doing it, why would they have had discussions about it before the union situation arose? With the employees. What they told the employees is this is possible if we can submit. And it is incorrect that the employees were told the time frame at the March meeting. At the March meeting, there's testimony that the plant manager at the time read the slides verbatim, and the slides said payout date to be determined, and that the period of examination would continue until year end. Yet the submission was made in mid-September and told to the employees on September or within 10 days of the representation election. Had the union not come on this. Do you think there is anything in the initial announcement to the employees that was any union or that they were anticipating problems beforehand or anything like that? Not in the initial announcement to employees, but there is testimony that even in November 2012, the company was aware of union organizing activity. I see that my time is up. Can I take a moment to address this situation involving Mr. Craft? The UAW is not the charging party on that issue. Thank you. She says we can't even consider the vote here. Well, Your Honor, that The effect of it is beyond our jurisdiction. Well, counsel is correct that there have been a number of circuit courts that have applied Supreme Court precedent to suggest that you cannot consider the direction of election. We would suggest Judge Wilkinson in his concurrence, not his dissent in intertape, got it right. The cases that the circuit courts, the Supreme Court cases that say that you can't review a direction of election, have to do with whether an election should be held in the first instance. Courts have taken that ruling and extended it to apply to situations where there's already been an election and now there's a direction of a second election. Is there a Sixth Circuit case? There is not a Sixth Circuit case. The only Sixth Circuit case applies the rule as counsel suggested. Judge Wilkinson in the Fourth Circuit in his concurrence, and then there's a Fifth Circuit case having to do with the decertification election. They both reached the conclusion that it makes no sense to have the very same UOPs that are the objections. These are not independent objections, UOPs. They're exactly the same facts that compromise the objections in this case. The theory, see if I can get it in my head, the theory that is something improper, what is the reason behind the principle that there's something improper in taking into account the effect of the unfair labor practice as you are considering whether there was an unfair labor practice? Yes, Your Honor. I believe that the premise of the Supreme Court's cases, the cases that counsel cited, is that the courts should not get in the way of letting an election go forward, that that's not a final order, and as a matter of... Did the Supreme Court say that there is no relationship that a court may consider even though there is clearly, in fact, a relationship between the unfair labor practice and the effect of it? That is to say, some unfair labor practices depend on what the effect of that is going to be on the election itself. Yes, Your Honor. And we can't consider what that effect is. Well, again, I think in the instance of a direction of a first election, the Supreme Court said that that was the case. We don't think that that's properly extended to the situation where you have parallel objections and UOPs and we're talking about the direction of a second election. I want to address the timing issue because... Yes. So it seems clear that this benefits program was being discussed by the company toward the end of 2012 and well into 2013. Yes, Your Honor. And Mr. Argus's Rivera had mentioned it in March, apparently. But NLRB says the problem here is just the timing of the announcement, that it was announced one week before the election and that timing in context is an unfair labor practice. It could have been announced later, a week later or whatever, just right on the eve of the election. Yes, Your Honor. So two things. First, Mr. Slocum, while his presentation did say date to be determined, the unrebutted testimony in the record is that Manager Paulus, who was at that meeting, said that Mr. Slocum said that the submission would come in the fall and that the payment would be made in the October timeframe. That was in March of 2013. The Board doesn't acknowledge that evidence, but there's nothing to rebut it. So the timing had already been announced to employees. Whether they chose to recall that or didn't recall it, the evidence in the record is that those timeframes were specifically noted by Mr. Slocum in March of 2013. The timing was to be the fall, but not necessarily one week before the election or one week after the election. Correct, Your Honor, but then there's another piece of evidence, which is that Safety Manager Rivera testified that the timing of the submission was dictated by the corporate offices. It was September 30th is the date that the submission was to be made. This was the last employee meeting before the submission was going to be made. And not only did it just say, hey, here's $400 you're going to get. Safety Manager Rivera got up and did an extensive presentation showing the substantive safety improvements that Caterpillar had realized that justified the submission of the award. There was one condition in this program, and it was set in 2012. If we submit a Chairman's Award submission, then this payment will be made. And the criteria for that submission, as Safety Manager Rivera testified, was set by the corporate offices. It wasn't sort of Caterpillar at the facility subjectively deciding whether or not it felt like giving employees money. So there's evidence that the timing was set and announced before the critical period. And the law is, in fact, at the Torbett case, by the way, and Stan and I, in both of those cases, there was no announcement to employees before the critical period. And nonetheless, this court and the board found that those payments and actions there were perfectly lawful because the employer was able to demonstrate a substantial business justification for the timing. And we would suggest that the continuum of activity from late 2012 all the way through September demonstrates that there was evidence of the timing as to when it should be submitted as well as when the payment could be expected. And for those reasons, we would ask that the board's order not be used. Okay. Thank you, Mr. Torres. And thank you all, counsel, for your presentation today. We very much appreciate it.